772 P.2d 322

STATE of New Mexico,
Plaintiff–Appellee,

v.

Terry D. CLARK, Defendant–Appellant.

No. 17265.

Supreme Court of New Mexico.

March 9, 1989.

Rehearing Denied May 15, 1989.

**290**

Rothstein, Bennett, Daly, Donatelli & Hughes, Mark H. Donatelli, Martha A. Daly, Santa Fe, David I. Bruck, John H. Blume, Columbia, S.C., for defendant-appellant.

Hal Stratton, Atty. Gen., William McEuen, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

SCARBOROUGH, Justice.

Terry D. Clark (Clark) pled guilty to the kidnapping and murder in the first degree of Dena Lynn Gore. He was sentenced to death for the murder and twenty-six years imprisonment for the kidnapping. This appeal follows. We affirm Clark's convictions and the imposition of the death penalty.

We discuss: (1) denial of Clark's motion to withdraw his guilty plea; (2) the trial court's decision to delay imposing the non-capital portion of Clark's sentence until after the jury deliberations in the capital sentencing proceeding; (3) cross-examination and jury arguments of the State concerning the possible length of a life sentence; (4) testimony of the victim's mother and the State's jury arguments said to have violated the principles of *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987); (5) testimony concerning the costs of incarceration; (6) comment on Clark's failure to testify; (7) the validity of the statutory aggravating circumstance of "murder of a witness to a crime," and the admission into evidence of Clark's prior criminal record; (8) television coverage of Clark's allocution to the jury; (9) claims of reversible error due to the jury instructions; (10) review of the death sentence pursuant to NMSA 1978, Section 31–20A–4(C) (Orig.Pamp. & Cum.Supp.1988); (11) the proportionality guidelines of *State v. Garcia*, 99 N.M. 771, 664 P.2d 969, *cert. denied*, 462 U.S. 1112, 103 S.Ct. 2464, 77 L.Ed.2d 1341 (1983); and (12) Clark's claim of cumulative error.

## FACTS

Terry Clark had previously been convicted of the kidnapping and criminal sexual penetration of a six-year-old girl for which he received a sentence of twenty-four years imprisonment. Pending appeal of that conviction, he was released on bond and was living at his brother's ranch in Chavez

County, New Mexico. On July 17, 1986, about 6:00 p.m. in the afternoon, he forcibly abducted nine-year-old Dena Lynn Gore from near her home in Artesia, New Mexico. He drove her to his brother's ranch where he raped her, shot her three times in the head, and then buried her nude body in a shallow grave.

An extensive investigation and search for the victim followed her disappearance. Various suspicious circumstances caused Clark's older brother, Steve, together with a ranch hand, to search for the girl's body on the ranch on July 22, 1986. After locating the grave they notified the authorities who then recovered the body and arrested Clark.

While Clark's case was pending Governor Toney Anaya, on November 26, 1986, announced his decision to commute the death sentences of the five men then on death row. The Governor advised Clark's defense team that he would also commute Clark's death sentence if one were to be imposed prior to the expiration of his term of office on December 31, 1986. On December 4, 1986 Clark entered a plea of guilty to all charges. The trial judge denied Clark's request to hold a sentencing proceeding in December of 1986, and the New Mexico Supreme Court later declined to order the trial court to do so. On February 16, 1987, the trial court denied Clark's motion to withdraw the guilty plea. On May 7, 1987, a jury in Quay County sentenced Clark to death for the murder of Dena Lynn Gore.

## I. Withdrawal of Clark's Guilty Plea.

■ Clark complains that the trial judge erred in refusing to allow him to withdraw his guilty plea. Clark does not contest that the court's acceptance of the plea satisfied the requirements of Rule 5–303(E) & (F) which govern the taking of guilty pleas.[1] Rather, he claims that the trial judge should have permitted him to withdraw the plea in the interest of justice and fair play, and because granting the motion would not have prejudiced the prosecution. Clark argues that the actions taken by the Governor were inherently coercive and rendered his guilty plea suspect. We disagree, and hold that the trial judge did not abuse his discretion by denying the motion to withdraw the plea.

In November 1986, Clark learned from his defense counsel that Governor Anaya intended to commute the sentence of all persons currently on death row to a sentence of life imprisonment. Defense counsel advised Clark that if he were sentenced to death before the expiration of Anaya's term of office the Governor would commute his sentence also. On December 4, 1986, Clark entered a motion to change his plea to one of guilty to all charges. Prior to accepting the new plea, the trial judge advised Clark that not only was it impossible for the court to conduct sentencing proceedings before January 1, 1987, but also that the court had no intention of attempting to do so. Clark chose to enter the new plea in any case and acknowledged to the court that, in part, his decision was based upon the possibility of having a sen-

---

1. SCRA 1986, 5–303(E) & (F) require the trial judge to determine that the entry of a plea of guilty is intelligently and voluntarily given. The Rule in pertinent part provides:

E. *Advice to defendant.* The court shall not accept a plea of guilty * * * without first, by addressing the defendant personally in open court, informing him of and determining that he understands the following:
(1) the nature of the charge to which the plea is offered;
(2) the mandatory minimum penalty provided by law, if any, and the maximum possible for the offense to which the plea is offered;
(3) that the defendant has the right to plead not guilty, or to persist in that plea if it has already been made; and

(4) that if he pleads guilty * * * there will not be a further trial of any kind, so that by pleading guilty * * * he waives the right to a trial.

F. *Ensuring that the plea is voluntary.* The court shall not accept a plea of guilty * * * without first, by addressing the defendant personally in open court, determining that the plea is voluntary and not the result of force or threats or promises apart from a plea agreement. The court shall also inquire of the defendant, defense counsel and the attorney for the government as to whether the defendant's willingness to plead guilty * * * results from prior discussions between the attorney for the government and the defendant or his attorney.

tence of death commuted by Governor Anaya. Clark also stated to the court that he had decided to plead guilty about three weeks prior to learning of the Governor's possible intervention. He stated that he did not believe any consideration of a possible commutation had been involved in his decision at that time. Clark stated that he understood the rights he was giving up by pleading guilty and that he knew he would be unable to withdraw the plea if a death sentence were to be imposed. He then admitted to the court that he had committed the crimes with which he had been charged and proceeded to describe the factual details of those crimes. The trial judge accepted the guilty plea after concluding that it was knowingly and voluntarily entered.

On December 10, 1986, this Court denied Clark's motion for an extraordinary writ ordering the trial court to conduct the sentencing proceeding in December of 1986. On February 16, 1987, Clark moved to withdraw his plea and the motion was denied.

■ Clark must show that the trial judge abused his discretion by refusing to allow him to withdraw his guilty plea prior to sentencing. *State v. Brown*, 33 N.M. 98, 263 P. 502 (1927); *State v. Kincheloe*, 87 N.M. 34, 528 P.2d 893 (Ct.App.1974). In *Brown*, this Court concluded that the defendant was entitled to withdraw his plea where he acted promptly to withdraw a guilty plea induced by threats, entered without the benefit of counsel, and where he asserted his innocence and stated a defense. 33 N.M. at 101, 263 P. at 504. In *Kincheloe*, the court found denial of a motion to withdraw a guilty plea to constitute manifest error when the undisputed facts showed that the plea could not have been knowing and voluntarily made. 87 N.M. at 36, 528 P.2d at 895. Consideration of factors such as these, taken together, must guide the exercise of a trial court's discretion. Federal courts consider similar factors when deciding a presentence mo-

tion to withdraw a guilty plea. *E.g., United States v. Carr*, 740 F.2d 339, 343 (5th Cir.), *cert. denied*, 471 U.S. 1004, 105 S.Ct. 1865, 85 L.Ed.2d 159 (1985); *United States v. Spencer*, 836 F.2d 236 (6th Cir.1987).[2] While possible prejudice to the prosecution is also a factor to be considered, absence of prejudice to the prosecution, by itself, is insufficient to mandate permission for presentence withdrawal of a plea of guilty. *See Carr* at 345; *United States v. Saft*, 558 F.2d 1073, 1083 (2d Cir.1977), *cited with approval in* Fed.R.Crim.P. 32(d) advisory committee note; *see also American Bar Association Standards for Criminal Justice* § 14–2.1 commentary at 52–53 (2nd ed. 1980). Thus, the defendant has the initial burden to establish sufficient grounds for permitting the plea to be withdrawn, and he does not meet that burden solely by showing an absence of prejudice to the prosecution.

With these considerations in mind, we must conclude that Clark failed to establish any valid reason why the trial court should have granted his motion. He admits compliance with the relevant procedural requirements to ensure that the plea was knowingly and voluntarily, and does not now claim the original plea was otherwise. He did not assert his innocence when he first sought to withdraw the plea, nor does he now on appeal. At the time he entered the plea, Clark had the close assistance of a team of four defense attorneys. Finally, Clark waited two and one-half months before seeking a withdrawal. Under these circumstances there was no abuse of discretion in denying the motion to withdraw the plea.

Moreover, we disagree with the suggestion that his plea was any less knowing and voluntary because of the representations of the Governor. Clark persisted with his request to enter the plea with the full knowledge of the court's intention not to hold a sentencing hearing before the end of 1986 and the expiration of the Governor's term

---

**2.** *See also* SCRA 1986, 5–304 committee commentary, citing the recommendations of *The American Bar Association Standards Relating to Pleas of Guilty* Section 2.1 (approved draft 1968). The recommendation concerning a motion for withdrawal of a guilty plea prior to sentencing mirrors the federal rule. *See* Fed.R. Crim.P. 32(d).

of office. Also, at the time Clark entered the guilty plea he informed the court, and did not later recant, that he had decided to plead guilty prior to the time he became aware of a possible commutation. Thus, the possible intervention of the Governor was only one factor in his decision to enter the plea. While the Governor's actions no doubt influenced Clark's decision to plead guilty, we cannot say the Governor's actions improperly compelled that decision. More to the point, we agree with the court in *United States v. Carr* which stated that the purpose for allowing a defendant to withdraw a guilty plea is "not to allow a defendant to make a tactical decision to enter a plea, wait several weeks, and then obtain a withdrawal if he believes that he made a bad choice." 740 F.2d at 345.

II. Delay in Imposing the Noncapital Portion of Clark's Sentence.

■ The eighth amendment requires that the discretion afforded a capital jury "must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. 153, 189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976). Clark argues that the jury's understanding of the sentencing alternatives available to them was affected by two related arbitrary factors, either of which requires reversal: (1) delay in imposing Clark's sentence on the noncapital charge of kidnapping; (2) cross-examination and argument concerning the possible length of Clark's incarceration if sentenced to life imprisonment. We discuss these issues separately.

3. Under the Criminal Sentencing Act as amended in 1979, conviction of a capital felony calls for either a sentence of death or life imprisonment. NMSA 1978, § 31–18–14 (Repl.Pamp. 1987); NMSA 1978, § 31–20A–1 (Repl.Pamp. 1987). Under the Probation and Parole Act as amended in February of 1980, an inmate who is sentenced to life imprisonment for the commission of a capital felony becomes eligible for a parole hearing after he has served thirty years of his sentence. NMSA 1978, § 31–21–10(A) (Repl.Pamp.1987).

4. The jury was provided with the following instruction at the request of defense counsel:

Prior to the commencement of the sentencing proceeding Clark moved the district court to impose his sentence on the kidnapping charge before jury deliberations on the death sentence for capital murder. Clark faced the basic eighteen-year sentence for kidnapping in addition to a possible life sentence for murder as an alternative to the death penalty.[3] NMSA 1978, § 31–18–15(A)(1) (Repl.Pamp.1987). Also, after hearing evidence of mitigating or aggravating circumstances, the court could decide to increase or decrease the basic eighteen-year sentence by as much as one-third, NMSA 1978, Section 31–18–15.1 (Repl.Pamp.1987), and then decide whether the sentence was to be served concurrently or consecutively with the twenty-four year sentence imposed for Clark's previous conviction. NMSA 1978, § 31–18–21 (Repl. Pamp.1987). Additionally, the basic sentence was subject to a one-year enhancement for the use of a firearm, and a one-year enhancement under the habitual offender statute. NMSA 1978, § 31–18–16(A) (Repl.Pamp.1987); NMSA 1978, § 31–18–17(B) (Repl.Pamp.1987). Clark argued in his motion that the court's failure to first impose sentence on the noncapital charge would unnecessarily enlarge the range of sentences available, and would confuse the jury about the effect of its verdict. The trial judge denied the motion stating that it would be inappropriate to sentence Clark on the kidnapping charge prior to the jury's decision regarding the sentence for capital murder. Instead, counsel was allowed to inform the jury what options were open to the court under the Criminal Sentencing Act.[4]

Without requiring testimony or other evidence, the court has taken notice that:
1. Under the prior conviction defendant was sentenced to the custody of the Corrections Department to be imprisoned for a term of eighteen (18) years under count I followed by two years parole, and nine (9) years under count II, three years to be suspended, followed by two years of parole.
2. Under the prior conviction defendant is to serve each count consecutive to one another.
3. Under the present conviction for murder, defendant shall be sentenced to death or life imprisonment.

Clark now argues that no jury could be expected to give serious consideration to sentencing Clark to life imprisonment unless it was confident that such a sentence would protect society by isolating Clark in prison for most or all of his life. In his opening statement, defense counsel had conceded to the jury that Clark should not again be released into society.

We agree with Clark that if the jury had decided not to impose the death penalty, the terms of Clark's sentence on the kidnapping charge would significantly affect the timing of his eligibility for release on parole. When the trial judge later sentenced Clark on the kidnapping charge he imposed the maximum allowable term, to be served consecutive to his other convictions. The question is whether the court was required to impose the noncapital sentence in advance in order that the jury might take that information into account in deciding whether or not to impose the death sentence. Clark argues that he had a constitutional right under *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), and *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), to have the jury informed of his kidnapping sentence, in order to firmly fix the time when he might become eligible for parole, before the jury retired to consider the penalty for murder.

There is no dispute that the eighth amendment requires that the sentencing jury must be allowed to consider any aspect of the defendant's character and record and any of the circumstances of the offense proffered in mitigation. *Eddings v. Oklahoma*, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982); *Lockett*, 438 U.S. at 604, 98 S.Ct. at 2964 (Burger, C.J.,

plurality opinion). In *Eddings*, the judge refused to consider the defendant's youth, history of a violent family background, and severe emotional disturbance. 455 U.S. at 115, 102 S.Ct. at 877. The jury in *Lockett* was barred from considering evidence of the defendant's youth, lack of specific intent to cause death, and relatively minor role in the crime. 438 U.S. at 597, 98 S.Ct. at 2961. The evidence in both *Eddings* and *Lockett* was mitigating because it tended to diminish the defendant's responsibility for the crime. In *Skipper*, the jury was barred from considering testimony regarding the defendant's good behavior during the seven months he spent in jail awaiting trial. 476 U.S. at 4, 106 S.Ct. at 1671. The Court stated that evidence concerning a defendant's past conduct was indicative of probable future behavior and, therefore, was relevant to the question of his "future dangerousness." *See id.* at 5, 106 S.Ct. at 1671. Clark argues that a far more important determinant of whether a capital defendant poses a risk of future violence than his pretrial good conduct in jail is the question of his eligibility for parole. Thus, Clark claims, under the rationale of *Skipper*, his possible ineligibility for parole, for virtually the remainder of his life, is a mitigating circumstance which cannot be constitutionally withheld from the jury.

We do not agree that the potential period of confinement of a capital defendant sentenced to life imprisonment is a mitigating circumstance under the eighth amendment jurisprudence of the United States Supreme Court. That Court has repeatedly defined relevant mitigating circumstances as facts about the defendant's character or background or the circumstances of the particular offense that may call for a penalty less than death. *See Skipper*, 476 U.S.

4. Under the present conviction for kidnapping, the basic sentence established by law equals eighteen (18) years imprisonment.

5. Under the present conviction for kidnapping, if the court finds that mitigating or aggravating circumstances exist, it has the authority to increase or decrease the basic sentence up to one-third.

6. If the court finds that the defendant has a prior conviction, it must increase his basic sentence by one year; if the court finds that a firearm was used in the present conviction, it

must increase the basic sentence by an additional one year.

7. The court may order that defendant serve the prior and present convictions either consecutive or concurrent to the remainder of the term.

8. The court has no authority to suspend or defer any sentence to be imposed in this case.

You may, but are not required to, accept this as a fact.

at 4, 106 S.Ct. at 1671; *Eddings,* 455 U.S. at 110, 112, 102 S.Ct. at 874, 875; *Lockett,* 438 U.S. at 605, 98 S.Ct. at 2965; *California v. Brown,* 479 U.S. 538, 541, 107 S.Ct. 837, 839, 93 L.Ed.2d 934 (1987). In *Skipper,* the evidence that "the defendant would not pose a danger if spared" was evidence regarding his *character.* It is the defendant's own conduct and background that is the source of mitigating evidence regarding his potential for future dangerous behavior that the jury must be allowed to consider. The sentencing prerogatives of the trial judge, or the possible length of a life sentence, simply have no relevance under eighth amendment standards as they have developed so far.

Moreover, it can not be guaranteed that the jury would respond in a positive fashion to the information which Clark sought to put before them. Instead, information of this sort may have an impermissible prejudicial effect, especially where the evidence is evenly balanced. In Clark's case, after the jury returned a verdict of death, the trial judge imposed the maximum enhanced sentence of twenty-six years on the kidnapping charge, and then ordered that the sentence be served consecutive to Clark's other convictions. This was the most severe sentencing option open to the court. It is almost universally accepted that a trial judge should not express or otherwise indicate to the jury an opinion on whether a defendant is guilty of criminal charges. *See American Bar Association Standards for Criminal Justice* § 15–3.8 commentary at 113–14 (2nd ed. 1980). Similarly, any action taken by a trial judge during a capital sentencing proceeding which might be interpreted to reflect on the defendant's culpability for his capital crime must also be avoided. Here, the court was under a duty to base its noncapital sentencing decision on the same evidence in mitigation and aggravation as was presented to the capital jury. *See* NMSA 31–18–15.1(A) (Repl. Pamp.1987). The court's decision could not be viewed in isolation from the one faced by the jury on the appropriate penalty for the capital crime of murder. If the judge had made his sentencing decision prior to the capital jury deliberations, his decision may well have had an impermissible effect on the jury. For these reasons, we conclude that the trial judge did not abuse his discretion in refusing to impose the noncapital sentence until after the capital jury deliberations.

### III. Statements Concerning the Possible Length of a Life Sentence.

Clark asserts that while the judge's withholding of the noncapital sentence was in and of itself sufficiently prejudicial to require reversal, the prejudice was greatly exacerbated by the prosecutor's unfair cross-examination and closing argument to the jury concerning the possible length of a life sentence.

As discussed, much of Clark's defense was intended to assure the jury that if Clark were sentenced to life imprisonment he would pose no further threat to society. Defense counsel embarked on the task of advising the jury of the approximate period of confinement Clark faced, and at what time he might become eligible for parole. Defense counsel first sought to have Clark sentenced on the kidnapping charge before the jury retired, a request appropriately denied. At the sentencing proceeding, Clark introduced into evidence a chart showing the effect of various sentencing alternatives open to the court, and the effect of possible meritorious deductions, or "good-time" awards, by the Corrections Department.[5] The chart showed that if Clark received a life sentence, and also maximum leniency from the court on the kidnapping charge, Clark would not be con-

---

5. Under the Corrections Act, Section 33–2–34, any inmate confined in the penitentiary may be awarded a meritorious deduction of thirty days per month for his good conduct and the performance of industrial labor. NMSA 1978, § 33–2–34 (Repl.Pamp.1987 & Supp.1988). Neither that statutory provision, nor our previous court decisions, address the question of whether these credits may reduce the period of thirty years an inmate sentence to life imprisonment must serve before he becomes eligible for a parole hearing pursuant to the Probation and Parole Act. *See* NMSA 1978, § 31–21–10(A) (Repl.Pamp.1987) (as amended February, 1980). That question is not before us today.

sidered for parole until he had served at least thirty years in prison and reached the age of sixty-one. This conclusion was based upon the premise that good-time awards by the Corrections Department were inapplicable towards a life sentence.

The defense called the records administrator of the Corrections Department, Ms. Cathy Catanach, to testify as an expert on sentencing and to explain the chart to the jury. On direct examination, however, she stated that there was a difference of opinion between the Corrections Department and the State Attorney General on whether good-time credits could be awarded against a life sentence. She stated that the department was keeping good-time records on prisoners serving a life sentence and that Clark could be paroled at the age of forty-six if he received such awards.

On cross-examination the expert affirmed her view that the Corrections Department was not bound by the Attorney General's opinion. She stated that the department currently was treating life sentences as eligible for meritorious deductions against the thirty-year minimum. On further cross-examination, the expert assented to other factors which the prosecutor suggested might affect Clark's possible release date, such as: the commutation authority of the governor; possible legislative amendments; future judicial decisions; and policy changes of the Corrections Department. The witness concluded that, given the variables, she did not feel comfortable predicting the term any inmate would serve.

The question of when Clark might become eligible for parole again became an issue in the closing arguments of both defense counsel and the prosecutor. Defense counsel argued that if Clark received "every break in the world" he would not be eligible for parole until he was sixty-one. In his rebuttal argument the prosecutor made the following statement:

> [Defense counsel] talked briefly about sentencing in this case and the possible length of time. The question is not when Terry Clark will get out—it's, I'm sorry, it's not if Terry Clark will get out, it's

when he'll get out. It is inevitable. And as we tried to point out to you on cross-examination when this man, if this man, is sentenced to life, there are no guarantees. No guarantees. Somewhere down the road is another victim. Whether it's ten years from tomorrow, twenty years from tomorrow, or longer, she's out there, or she will be out there.

Defense counsel failed to make any objection to this closing argument, or to the earlier cross-examination of the defense expert. In view of the fact that in a number of instances what is now asserted to be reversible error passed without objection during the sentencing proceedings, a general discussion of our scope of review in this case is warranted.

Generally, failure to make a timely objection to allegedly improper testimony or argument bars review of the issue on appeal. *State v. Tafoya*, 94 N.M. 762, 764, 617 P.2d 151, 153 (1980); *State v. Ruffino*, 94 N.M. 500, 502, 612 P.2d 1311, 1313 (1980); *State v. Casteneda*, 97 N.M. 670, 678, 642 P.2d 1129, 1137 (Ct.App.1982). Claims of error involving fundamental rights should be brought to the attention of the trial court in order that the trial judge may, if possible, correct the alleged violation before the jury retires. Absent a timely objection which invokes a ruling of the trial court, the fundamental rights of a party are subject to waiver. *State v. Escamilla*, 107 N.M. 510, 760 P.2d 1276 (1988). Review of the issue in an appellate court is then discretionary. SCRA 1986, 12–216(B). An exception to the general rule barring review of questions not properly preserved below, however, applies in cases which involve fundamental error. *State v. Compton*, 104 N.M. 683, 687, 726 P.2d 837, 841, *cert. denied*, 479 U.S. 890, 107 S.Ct. 291, 93 L.Ed.2d 265 (1986); *State v. Ramirez*, 98 N.M. 268, 269, 648 P.2d 307, 308 (1982). Fundamental error cannot be waived. *Escamilla*, 107 N.M. at 515, 760 P.2d at 1281.

While we adhere to the principle that a capital sentencing determination requires a "greater degree of scrutiny" than the imposition of all other penalties, *Comp-*

*ton,* 104 N.M. at 688, 726 P.2d at 842, the accused is not thereby excused from raising questions of alleged error during the sentencing proceeding itself. *See, e.g., State v. Cheadle,* 101 N.M. 282, 287, 681 P.2d 708, 713 (1983), *cert. denied,* 466 U.S. 945, 104 S.Ct. 1930, 80 L.Ed.2d 475 (1984) (noting that even in death penalty cases objections to jury instructions cannot be raised for the first time on appeal). The trial judge, who has observed the entire proceedings, is in the best position to make the factual determination of whether the violation has occurred and evaluate the extent of any possible prejudice. *State v. Gonzales,* 105 N.M. 238, 243, 731 P.2d 381, 386 (Ct.App.1986), *cert. quashed,* 105 N.M. 211, 730 P.2d 1193 (1987). At that point the error may be susceptible to correction, or if not, a new trial may be ordered without further waste of judicial resources. To the greatest extent possible, all issues which bear upon the validity of the sentencing determination should be fully aired in the trial court. The relaxation of the timely objection rule in capital cases may encourage the defense to gamble on the verdict with the intent of raising the claim of error on appeal if the gamble does not pay off. To the extent alleged violations rise to the level of fundamental error, the question will be reviewed on appeal and, if fundamental error exists, a new trial will be ordered. Otherwise, a claim of error must first be addressed in the trial court to preserve the issue for appeal.

■ Returning to the question of the propriety of the extensive testimony and argument during the sentencing proceedings concerning Clark's possible release, we recognize that a majority of state courts have held it improper for the jury to consider or be informed of the possibility of commutation, pardon, or parole. *See Murray v. State,* 359 So.2d 1178 (Ala.Crim.App. 1978); *People v. Morse,* 60 Cal.2d 631, 388 P.2d 33, 36 Cal.Rptr. 201 (1964); *People v. Walker,* 91 Ill.2d 502, 64 Ill.Dec. 531, 440 N.E.2d 83 (1982); *State v. Lindsey,* 404 So.2d 466 (La.1981), *cert. denied,* 464 U.S. 908, 104 S.Ct. 261, 78 L.Ed.2d 246 (1983); *Poole v. State,* 295 Md. 167, 453 A.2d 1218 (1983); *State v. Atkinson,* 253 S.C. 531, 172

S.E.2d 111 (1970), *vacated on other grounds,* 408 U.S. 936, 92 S.Ct. 2859, 33 L.Ed.2d 752 (1972). *Contra State v. Jackson,* 100 Ariz. 91, 412 P.2d 36, *cert. denied,* 385 U.S. 877, 87 S.Ct. 156, 17 L.Ed.2d 104 (1966). These decisions, and we would agree, generally view such considerations to be inconsistent with the jury's proper decision-making role, or the relevant sentencing considerations as fixed by statute. *E.g., People v. Brisbon,* 106 Ill.2d 342, 88 Ill.Dec. 87, 478 N.E.2d 402, *cert. denied,* 474 U.S. 908, 106 S.Ct. 276, 88 L.Ed.2d 241 (1985) (holding that parole eligibility is immaterial to either the aggravating or mitigating issues of a capital sentencing proceeding). We recognize, however, that the eighth amendment does not prohibit providing the jury with accurate information concerning postsentencing procedures. *See California v. Ramos,* 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983).

■ In this case, any error in the prosecutor's cross-examination and argument was waived by Clark's failure to object and inform the trial court why the questioning and argument were improper. Review of the issue is limited to whether the prosecutor's actions constitute fundamental error. The doctrine of fundamental error is to be applied only under exceptional circumstances and solely to prevent a miscarriage of justice. *State v. Tipton,* 73 N.M. 24, 385 P.2d 355 (1963); *see also State v. Rodriguez,* 81 N.M. 503, 469 P.2d 148 (1970); *State v. Padilla,* 104 N.M. 446, 451, 722 P.2d 697, 702 (Ct.App.), *cert. denied,* 104 N.M. 378, 721 P.2d 1309 (1986).

We hold the doctrine has no application to the circumstances of this case where the question of Clark's possible release and the term of a life sentence was introduced and argued by the defense as part of its case-in-chief. It was error to place the issue of Clark's eligibility for parole and the parole laws before the jury. The consideration is immaterial to the aggravating and mitigating issues of our capital sentencing proceedings. However, the defense introduced the issue of parole eligibility as a central part of its defense, and without objection allowed extensive cross-examina-

tion and later argument on the question. Once the issue was introduced it was not surprising that the prosecutor, in rebuttal, sought to point out all of the factors which bear upon the possibility of release after conviction of a life sentence. Cross-examination is permitted on the subject matter of direct examination, SCRA 1986, 11–611, and, as a general proposition, a prosecutor is entitled to respond to defense counsel's argument. *State v. Muise*, 103 N.M. 382, 392, 707 P.2d 1192, 1202 (Ct.App.), *cert. denied*, 103 N.M. 287, 705 P.2d 1138 (1985).

■ The fundamental error rule guards against the corruption of justice. *State v. Rogers*, 80 N.M. 230, 453 P.2d 593 (Ct.App. 1969). The doctrine has no application in cases where the defendant by his own actions created the error, where to invoke the doctrine would contravene that which the doctrine seeks to protect, namely, the orderly and equitable administration of justice. *See Padilla*, 104 N.M. at 449–51, 722 P.2d at 700–02.

IV. Testimony of the Victim's Mother and the State's Argument to the Jury.

Clark claims that the jury was permitted to receive and consider evidence and argument wholly unrelated to his blameworthiness, and this factor created an impermissible risk that the capital sentencing decision would be made in an arbitrary manner as proscribed by *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). First, Clark argues that the examination of the victim's mother deliberately introduced the anguish of the victim's mother. Second, Clark argues that the prosecutor in his closing argument invited the jury to impose the death sentence based upon the relative worth of the lives of the victim and the defendant.

We accept the proposition advanced by Clark that his death sentence must be reviewed in light of *Booth* although that case was decided six weeks after Clark's sentencing. *See Yates v. Aiken*, 484 U.S. 211, 108 S.Ct. 534, 98 L.Ed.2d 546 (1988); *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987). In *Booth*, the Supreme Court rejected the contention that

the emotional distress of the victim's family or the victim's personal characteristics (including his perceived social worth) are proper sentencing considerations in a capital case. 107 S.Ct. at 2535. The *Booth* Court reversed the imposition of a death penalty where a detailed five-page victim impact statement had been introduced by the State. In doing so the Court observed, however, that "[s]imilar types of information may well be admissible because they relate directly to the circumstances of the crime." *Id.* at 2535 n. 10.

■ In this case, during direct examination of the victim's mother by the prosecutor, Mr. Plath, the following exchange took place:

MR. PLATH: About how long did you spend driving around looking for her, if you can give us an idea?

MRS. GORE: I don't know how long I spent. I know that I would continue coming back to the house after a few minutes to see if she had checked in yet.

\* \* \* \* \* \*

Q: Now did you ever see your daughter again?

A: No.

Q: During the next few days, were you aware of any efforts to locate your daughter by the community or by agencies of the community?

A: Yes. The police department was looking for her. They had called the FBI and there were several assistants looking for Dena.

Q: Did you yourself participate in that?

A: Not until Sunday.

Q: Were there any sort of notices sent out, or pictures?

A: Yes. I made flyers. I had flyers made up at City Hall out of a picture I had of Dena of her school pictures.

Q: Were they circulated in Artesia?

A: Yes. And they were also circulated in Carlsbad and Roswell and anywhere else we could send them.

Clark asserts that the victim's mother gave the above testimony in a quavering voice filled with emotion and grief. He argues that there was no conceivable rea-

son for introducing this testimony other than to accomplish what *Booth* forbids. We disagree. Ms. Gore's testimony was brief. The recordings of the proceedings show that her testimony was not overly emotional. She described where she lived, who her children were, when she returned home from work, and similar background information. She described her daughter leaving for a nearby store on her brother's bicycle and not returning. She described her daughter's clothing and her subsequent search for the missing girl. She then described reporting the matter to the police, and identified a picture she gave the police.

Ms. Gore's testimony was admissible under NMSA 1978, Section 31–20A–1(C) for two reasons. First, the testimony was relevant to show the aggravated circumstance of kidnapping. Despite Clark's plea of guilty, the State was still required to prove beyond a reasonable doubt that the murder was committed during the course of a kidnapping, and the State was not required to present its case in the abstract. Second, the testimony was directly related to the circumstances of the crime itself. While Clark had entered a guilty plea to all charges and he was willing to stipulate to the facts surrounding the girl's disappearance, guilty pleas and stipulated facts are no substitute for the evidence of a crime to be considered by a jury. We will not read *Booth* so as to exclude all testimony concerning a capital crime from anyone who was close enough to the victim to be emotionally affected.

Lastly, we note that Ms. Gore's testimony actually contained none of the elements proscribed in *Booth*: descriptions of the character and reputation of the victim; descriptions of the emotional impact of the crime upon the victim's family; and opinions of the victim's family characterizing the crime or the defendant.

■ Clark also argues that the prosecutor's closing argument constitutes a separate violation of the standards set forth in *Booth*. The prosecutor made the following rebuttal argument in his closing statement to the jury:

This case is not just about Terry Clark. And at this point I totally reject the efforts of counsel and Mr. Clark to tear that girl from this room. Dena Lynn Gore. Dena Lynn Gore. DENA LYNN GORE, NINE YEARS OLD.

\* \* \* \* \* \*

You know every time twelve citizens sit on a criminal case a very important thing happens. I'm not talking about citizens' duty. I'm talking about values. What we as a people in a community stand for. What we in particular situations state are our values. What are our priorities. And every verdict that has [been] returned in every criminal case is unmistakably a question of values, a statement of values, because it holds like a banner out to the community what our values are.

No, you cannot say in dollars and cents how much a life is worth. That cannot be done. I wouldn't ask you to put a dollar value on Dena Gore's life, but if Dena Gore's life, what is it worth? [sic] So much has become devalued. Our money is not worth what it used to be. Grades in school are inflated. It's a symptom of our modern life, and the devaluation creeps into our morality. If a victim, if an innocent victim's life, if a nine-year-old child, innocent victim's life, is not. even worth the life of that man, what does it say about us? What does it say about us? How profane, having viewed the circumstances under which this child's life was taken to then make a gift of thirty or forty or fifty years to Mr. Clark. [Defense counsel's] logic is, well, you can't give it to Dena Gore, so you might as well give it to Terry Clark. Is that what we want to state as our values? What's her life worth? Isn't it, isn't it at least worth his life in the scales of justice? Isn't it worth that much to us? Isn't her innocence, her defenselessness, aren't those things worth at least the life of the cunning and cruel and guilty? Let's not devalue her life.

The United States Supreme Court in *Booth* recognized that the perceived social worth of a murder victim is not a proper sentenc-

ing consideration. *Id.* at 2534 n. 8. Clark contends that the prosecutor's closing argument is an explicit appeal to the jury to weigh the relative worth of the murderer, Terry Clark, and his victim, Dena Lynn Gore. The State answers that the prosecutor's argument equates the value of their lives in making an argument for retribution, that the taking of the life of Dena Lynn Gore justifies the taking of Terry Clark's life.

We agree with the State that the prosecutor's argument to the jury was not an explicit invitation to weigh or compare the relative merits of the lives of Clark and his victim. The rebuttal argument equated the value of their lives in asking for retribution. Retribution is an accepted basis for imposing the death penalty and a permissible subject for prosecutorial argument. *Gregg v. Georgia,* 428 U.S. 153, 183, 96 S.Ct. 2909, 2930, 49 L.Ed.2d 859 (1976) (Stewart, Powell and Stevens, JJ., plurality opinion). We note that the prosecutor did not offer the personal characteristics of Dena Lynn Gore as justification for executing Clark. The only characteristics which were mentioned, her defenselessness and innocence, were generic to children, as opposed to those personal to the victim. Choice of this class of victim, a nine-year-old girl, is a circumstance of the crime which *Booth* does not purport to bar. *See Booth,* 107 S.Ct. at 2534 n. 7 (decision of murderer to attack a vulnerable victim is a factor which reflects on culpability since that circumstance is under his control).

Moreover, the prosecutor's rebuttal argument concerning the worth and value of the victim's life was in direct response to closing arguments of the defense. Defense counsel advised the sentencing jury that in making their decision they were being asked to "weigh the value of a life," and that no one had said that Clark's life was not "worth saving." Defense counsel stated that Dena Lynn Gore's life was gone, and there was nothing the jury could do to bring it back, but the jury now held Terry Clark's life in their hands. The prosecutor in arguing for retribution was allowed to respond to the arguments of the defense. The defense argument, we believe, tended to downplay the value of a life which was irretrievably lost. The comments of the prosecutor in rebuttal were not improper under these circumstances.

## V. Testimony on the Cost of Incarceration.

■ Clark argues that the prosecutor introduced an arbitrary and prejudicial factor into the determination of his sentence by eliciting testimony concerning the cost of incarceration. The subject arose when the prosecutor cross-examined Ms. Catanach from the Corrections Department. The prosecutor asked Ms. Catanach the average cost to house a prison inmate and was told that the cost was about fifty dollars per capita per day. Defense counsel made no objection. Later the defense pursued the issue by questioning a different witness, the Rev. Stewart, on the subject of the value of human life and the ethics of taking the costs of incarceration into account in making a capital sentencing decision.

It is well settled that the cost of incarceration is not a legitimate capital sentencing consideration. *Tucker v. Kemp,* 762 F.2d 1480, 1486 (11th Cir.1985) (en banc), *sentence vacated,* 474 U.S. 1001, 106 S.Ct. 517, 88 L.Ed.2d 452 (remanded for reconsideration in light of *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985)), *judgment reinstated,* 802 F.2d 1293 (1986), *cert. denied,* 480 U.S. 911, 107 S.Ct. 1359, 94 L.Ed.2d 529 (1987); *Brooks v. Kemp,* 762 F.2d 1383, 1412 (11th Cir. 1985), *sentence vacated,* 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986) (remanded for reconsideration in light of *Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986)), *judgment reinstated,* 809 F.2d 700, *cert. denied,* 478 U.S. 1022, 106 S.Ct. 3337, 92 L.Ed.2d 742 (1987); *Collier v. State,* 101 Nev. 473, 705 P.2d 1126 (1985). The State admits that the content of the inquiry cannot be defended but argues that failure to object waived this issue, and that the isolated incident was not fundamental error which warrants reversal. We agree.

The doctrine of fundamental error should be applied sparingly, to prevent a miscarriage of justice, and not to excuse the failure to make proper objections in the court below. *State v. Aull*, 78 N.M. 607, 435 P.2d 437 (1967), *cert. denied*, 391 U.S. 927, 88 S.Ct. 1829, 20 L.Ed.2d 668 (1968). With regard to a criminal conviction, the doctrine is resorted to only if the defendant's innocence appears indisputable or if the question of his guilt is so doubtful that it would shock the conscience to permit the conviction to stand. *State v. Manlove*, 79 N.M. 189, 441 P.2d 229 (Ct.App.), *cert. denied*, 79 N.M. 159, 441 P.2d 57 (1968). Where a defendant appeals the imposition of the death penalty, the doctrine should be applied only where error in the sentencing proceedings sufficiently undermines confidence in the capital jury's decision. The question on review is whether there is a reasonable probability that any error changed the outcome of the sentencing hearing. *Cf. Tucker v. Kemp*, 802 F.2d 1293 (11th Cir.1986) (using "prejudice prong" of *Strickland v. Washington*, 466 U.S. 668, 693–94, 104 S.Ct. 2052, 2067–68, 80 L.Ed.2d 674 (1984), as the standard to determine if sentencing proceeding was fundamentally unfair).

The court in *Brooks* noted the undeniable impropriety of arguing that the execution of the defendant would save taxpayer's money. The court stated that the potential prejudice was somewhat minimized by the brevity of the comment and the tentativeness of the prosecutor in asserting it. *Brooks*, 762 F.2d at 1415. The *Tucker* court regarded similar remarks by a prosecutor clearly unprofessional and improper. However, both courts concluded that it was not likely that the brief remarks had great adverse impact and concluded that, given the circumstances, there was no reasonable probability that the improper arguments changed the outcome of the jury deliberation. *See Tucker*, 762 F.2d at 1488; *Brooks*, 762 F.2d at 1415.

The facts of this case are similar to those in *Brooks* and *Tucker* in that the prosecutor elicited only brief testimony concerning the cost of incarceration. Also the prosecutor did not return to the subject in later argument. We believe that the reaction of defense counsel is also significant. His failure to protest what he now contends is serious and highly prejudicial error suggests that the potential for serious prejudice was not apparent to one present during the proceedings. Instead, the defense treated the matter as one for argument, as evinced by the later examination of the Rev. Stewart.

We conclude that, because of the brevity of the testimony and the lack of further comments on the subject by the prosecutor, there is no reasonable probability that the testimony changed the outcome or significantly affected the jury's exercise of discretion in making the sentencing determination. The very brief testimony elicited by the prosecutor was not sufficiently prejudicial to be considered fundamental error.

## VI. Comment on the Defendant's Failure to Testify.

Next, Clark asserts that the prosecutor improperly commented to the jury about his failure to testify and that this too represents fundamental error. The State answers that none of the statements constituted error, or fundamental error, and that Clark's failure to object has waived the issue on appeal. The State contends that all of the statements to which Clark objects were references to his lack of candor with medical personnel testifying as defense experts. The State argues that Clark's failure to explain certain details of his crime to those experts undermined their opinions. Thus, the prosecutor's comments, understood in the context of an attack on the expert testimony, were permissible.

One of the medical experts Dr. Golding, testified that Clark suffered from posttraumatic stress syndrome. The expert, in part, based his opinion on Clark's description of his experiences while serving in the military. Dr. Golding expressed confidence in Clark's honesty with him. On cross-examination Dr. Golding conceded that omissions on Clark's part might be significant. The prosecutor asked Dr. Golding if he had discussed with Clark the bindings which were found on the victim's legs. He had

not. During closing argument the prosecutor attacked the opinions of Dr. Golding including his assertion that certain omissions or misrepresentations by Clark were not clinically significant:

> If he's telling the honest truth to Dr. Golding or anybody else, he's going to tell the whole truth. How can a person stand up there and say it's not important to know the whole truth. It's ludicrous. And when you care, when you put your stamp of approval, Dr. Golding, on Terry Clark, that he's telling the whole truth, he's forthright, and he's open, and I believe him. And he leaves out critical details of a crime. Whether they were clinically significant or not, they were left out, Terry Clark didn't say them. He didn't say how else he used Dena Gore, he didn't say, for instance, anything about what those bindings on her limbs were about. In fact, he never has. He has never told anybody about that. Lies, lies, lies. All the way through.

The second set of comments to which Clark objects came considerably later in the prosecutor's argument to the jury. The prosecutor had finished addressing the evidence of mitigating circumstances which the defense had presented during its case-in-chief. He then described the events of July 17th, that is, the evidence of the crime itself, which he advised the jury to consider in making their sentencing decision. After describing Clark's preliminary activities in Artesia, he continued with the following statement:

> He follows Dena Gore, snatches her up at the Allsup store and takes her out to Squaw Canyon Road where, at some point during this horror, he binds one of her hands. We don't see rope on the other. He ties one of those hands. They're not together ladies and gentlemen. They're not wrapped as you would to restrain a person to keep that person from getting away. We don't know exactly how the other hand was confined. He binds her legs separately. He wraps a cord around the left and the right ankle, separately ties them off. Well, that's not the way, of course, we tie people up if we want to keep them from running away, that's a little bit like putting a person in handcuffs and the handcuffs aren't connected. What good does that do? So there's a more insidious purpose here. But we don't know what that is because Terry Clark has never told us what he, why he did that. But what we do know is that Terry Clark abducted this child, and presumably raped her. And we don't know whether he raped her vaginally and anally, or only anally. We don't know anything else about that frenzied attack on this child. What we do know is that there is something very important to Mr. Clark about this kind of bondage that we don't know. He won't tell us. So she is, she is raped. And then she is executed.

The defense made no objection to any of these arguments.

Comment by the prosecutor upon a defendant's failure to testify violates the privilege against self-incrimination guaranteed by the Fifth and Fourteenth Amendments. *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). *Griffin* forbids either direct or indirect improper comments by the prosecution. *E.g., State v. Schrock*, 149 Ariz. 433, 438, 719 P.2d 1049, 1054 (1986); *People v. Jackson*, 28 Cal.3d 264, 304, 618 P.2d 149, 168 Cal.Rptr. 603, 623 (1980), *cert. denied*, 450 U.S. 1035, 101 S.Ct. 1750, 68 L.Ed.2d 232 (1981). The protection of the Fifth Amendment privilege is fully applicable to the sentencing phase of a capital murder trial. *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981).

■ The standard generally used for evaluating allegedly improper prosecutorial comments is whether the language used was manifestly intended to be or was of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify. *Hearn v. Mintzes*, 708 F.2d 1072, 1076 (6th Cir.1983); *United States v. White*, 444 F.2d 1274, 1278 (5th Cir.), *cert. denied*, 404 U.S. 949, 92 S.Ct. 300, 30 L.Ed.2d 266 (1971); *Knowles v. United States*, 224 F.2d 168, 170 (10th Cir.1955); *McCracken v. State*, 431 P.2d 513, 517 (Alaska 1967);

*State v. Lincoln,* 3 Haw.App. 107, 125, 643 P.2d 807, 819 (1982); *State v. Hunter,* 29 Wash.App. 218, 220, 627 P.2d 1339, 1342 (1981). We adopt that test today.[6]

Since the defense failed to object to these closing arguments, the right to raise the issue on appeal is waived. *See* SCRA 1986, 12–216(A). Review is limited to the question of whether any violation rises to the level of fundamental error. *See State v. Chavez,* 100 N.M. 730, 734, 676 P.2d 257, 261 (Ct.App.), *cert. denied,* 100 N.M. 689, 675 P.2d 421 (1984). If the violation constitutes fundamental error, failure to seek a ruling of the trial court does not bar review and requires reversal on appeal. *See State v. Ramirez,* 98 N.M. 268, 648 P.2d 307 (1982).

■ We agree that the first set of comments by the prosecutor did not compromise Clark's right to remain silent. There is nothing in the record that suggests the prosecutor manifestly intended these arguments as a comment on Clark's failure to testify. To decide if the jury would naturally and necessarily assume the statements to be such a comment, the statement must be viewed within its precise context and not in isolation. *See United States v. Robinson,* 651 F.2d 1188, 1197 (6th Cir.), *cert. denied,* 454 U.S. 875, 102 S.Ct. 351, 70 L.Ed.2d 183 (1981); *Hunter,* 29 Wash.App. at 220, 627 P.2d at 1342. We believe that the jury would have taken these remarks within the context they were made, that is, a permissible attack on the credibility of the defense expert, Dr. Golding.

■ We view the second set of comments differently. We disagree with the State's argument that the jury would also understand these comments to be within the context of Clark's failure to explain the matter to his psychologist. The context in which the second statement was made had

nothing to do with the testimony of expert witnesses. Rather, the prosecutor was summarizing the facts of the crime, so far as they were known to him, and commenting on the defendant's failure to fill in the gaps. A violation of the *Griffin* rule is evident in the repeated focus upon Clark's failure to "tell us," that is, those persons in the courtroom, certain details of the crime. The possible prejudice to Clark stems from the inference that Clark's use of the bindings was especially sinister since he chose not to disclose their purpose. The argument proceeded without objection. Where the defendant fails to object and chooses instead to await the verdict, his silence is waiver of the improper comments by the prosecutor. *See State v. Gruender,* 83 N.M. 327, 329, 491 P.2d 1082, 1084 (Ct. App.), *cert. denied,* 83 N.M. 324, 491 P.2d 1079 (1971). This rule is followed in numerous states where violations of the *Griffin* rule are involved. *See, e.g., People v. Murtishaw,* 29 Cal.3d 733, 756, 631 P.2d 446, 459, 175 Cal.Rptr. 738, 751, *cert. denied,* 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 464 (1981); *Clark v. State,* 363 So.2d 331, 333 (Fla.1978); *People v. Davis,* 125 Ill.App.3d 568, 569, 80 Ill.Dec. 879, 880, 466 N.E.2d 331, 332 (1984); *Commonwealth v. Brown,* 392 Mass. 632, 640, 467 N.E.2d 188, 195 (1984); *Martin v. State,* 674 P.2d 37, 41 (Okla.Crim.App.1983), *cert. denied,* 465 U.S. 1081, 104 S.Ct. 1448, 79 L.Ed.2d 767 (1984); *State v. Neal,* 73 Or. App. 816, 817, 699 P.2d 1171, 1172, *review denied,* 299 Or. 663, 704 P.2d 514 (1985).

After reviewing the violation for possible fundamental error, we conclude that there is no reasonable probability that the error was a significant factor in the jury's deliberations in relation to the rest of the evidence before them. The aggravating factors of the crime known to the jury concerning the kidnapping, rape and mur-

6. The United States Supreme Court has declined to hold that improper comments in violation of the Griffin Rule are always harmful or require automatic reversal. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *see also Satterwhite v. Texas,* 486 U.S. 249, 108 S.Ct. 1792, 1798, 100 L.Ed.2d 284 (1988). However, where the error is exposed, the prosecution has the burden to prove beyond a reasonable doubt

that the constitutional error did not contribute to the verdict and was, therefore, harmless. *See Chapman,* 386 U.S. at 24, 87 S.Ct. at 828; *see also State v. Frank,* 92 N.M. 456, 589 P.2d 1047 (1979); *State v. Lopez,* 105 N.M. 538, 734 P.2d 778 (Ct.App.1986), *cert. quashed,* 105 N.M. 521, 734 P.2d 761 (1987); *State v. Martin,* 84 N.M. 27, 498 P.2d 1370 (Ct.App.1972); *State v. Jones,* 80 N.M. 753, 461 P.2d 235 (Ct.App.1969).

der of the victim were overwhelming. The prejudicial effect of any inference the jury might have drawn from the prosecutor's improper remarks, in relation to the strength of the rest of the evidence, was by comparison minor. For these reasons, we do not believe that the outcome of the jury deliberation was affected by the error. Because the violation does not rise to the level of fundamental error, we will not reverse the verdict.

## VII. Aggravating Circumstances.

Clark attacks NMSA 1978, Section 31–20A–5(G) as applied to his case. Under New Mexico's capital sentencing procedures, a jury must unanimously find beyond a reasonable doubt and specify at least one of the aggravating circumstances enumerated in Section 31–20A–5. NMSA 1978, § 31–20A–3 (Repl.Pamp.1987). Here, the jury made the unanimous findings that the murder of Dena Lynn Gore was committed during the commission of a kidnapping, Section 31–20A–5(B), and was the murder of a witness to a crime for the purpose of preventing report of that crime, Section 31–20A–5(G). Clark claims that the "murder of a witness" aggravating circumstance is overbroad if it is construed to include cases where murder follows another crime against the same victim. *See Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983) ("an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder"); *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).

When a jury considers the aggravating circumstance of "murder of a witness" during capital sentencing, it is evaluating the motive or reason why the victim was murdered. When the motive for the murder was to avoid detection and arrest, the class of murders is adequately narrowed for eighth amendment purposes. *See Harich v. Wainwright,* 813 F.2d 1082, 1103 (11th Cir.), *reh'g granted,* 828 F.2d 1497 (1987), *opinion on reh'g,* 844 F.2d 1464 (1988)

(sentence affirmed). *Gray v. Lucas,* 677 F.2d 1086, 1110 (5th Cir.1982), *cert. denied,* 461 U.S. 910, 103 S.Ct. 1886, 76 L.Ed.2d 815 (1983). This remains true with the murder of a victim of an underlying felony if the motive for the killing is to avoid arrest and prosecution for the earlier felony. *See Harich,* 813 F.2d at 1104. The correct application of Section 31–20A–5(G) similarly narrows the class of murders eligible for the death penalty. Under that section, the motive for the killing must be to prevent reporting of a crime, testimony in a criminal proceeding, or retaliation for the victim's previous testimony. *See* NMSA 1978, § 31–20A–5(G). Consideration of this factor as an aggravating circumstance furthers the state's interest in preventing victims from being killed by felons attempting to avoid arrest and prosecution. This factor reasonably justifies imposition of a more severe sentence.

The remaining question is whether Section 31–20A–5(G) was properly applied in this case. The jury was instructed that it must find beyond a reasonable doubt that the victim was a witness to a crime and that she was murdered to prevent her from reporting that crime. Ample evidence supports the jury's finding that the aggravated circumstance existed. Witnesses testified to Clark's admission that he kidnapped Dena Lynn Gore, took her to his brother's ranch and raped her. They testified that Clark had told them that he became "frantic," took a gun and shot her to death. He is said to have stated that he believed he could not let her go "because that would be the end for him." His tape recorded guilty plea was played for the jury.

Also, evidence of Clark's prior conviction for kidnapping and criminal sexual penetration was admitted for the limited purpose of showing his motive in committing the killing. His earlier conviction was largely a result of information given to the police by the six-year old victim after Clark had released her. *See State v. Clark,* 104 N.M. 434, 722 P.2d 685 (Ct.App.1986). Since his decision to kill Dena Lynn Gore rather than release her was likely influenced by his earlier experience, the evi-

dence was highly relevant to show his motive for the killing. For that reason, his criminal record was properly admitted, accompanied by a limiting instruction, in order to establish the purpose for the killing. In a capital sentencing proceeding the jury may consider all evidence admitted at the guilt-innocense phase of a trial, which may include evidence of other crimes when offered as proof of motive, as well as additional evidence which is relevant to particular aggravating circumstances. NMSA 1978, § 31–20A–1(C) (Repl.Pamp.1987).

Clark further argues that the State has been able to "double count" aggravating circumstances since "every case involving murder in the commission of kidnapping * * * will also necessarily involve the 'murder of a witness.'" The two aggravating factors, however, are not subsumed one within the other. Many killings of kidnap victims, but by no means all, may be motivated by the desire to escape criminal prosecution. The requirement that the State prove beyond a reasonable doubt that the motive for the killing was the elimination of a potential witness sufficiently distinguishes a killing of this type from other killings committed during the commission of a kidnapping. Furthermore, killing during the commission of a kidnapping and killing motivated by a desire to avoid prosecution for the kidnapping, or other crimes, can co-exist as aggravating circumstances if both are proved beyond a reasonable doubt. *See Harich v. Wainwright,* 813 F.2d 1082 (11th Cir.), *reh'g granted,* 828 F.2d 1497 (1987), *opinion on reh'g,* 844 F.2d 1464 (1988) (sentence affirmed); *Adams v. Wainwright,* 764 F.2d 1356 (11th Cir.1985), *cert. denied,* 474 U.S. 1073, 106 S.Ct. 834, 88 L.Ed.2d 805 (1986); *Gray v. Lucas,* 677 F.2d 1086 (5th Cir.1982), *cert. denied,* 461 U.S. 910, 103 S.Ct. 1886, 76 L.Ed.2d 815 (1983).

VIII. Media Coverage of Clark's Allocution to the Jury.

■ Clark argues that the trial court erred by allowing television coverage of his allocution. We disagree. Clark abandoned his conditional pretrial request to bar television coverage and, in any case, Clark never made a showing that the relief was necessary.

Supreme Court Rule 23–107 authorizes television coverage of criminal proceedings in accordance with specified guidelines providing safeguards to ensure that media coverage shall not interfere with the defendant's due process right to a fair trial. *See* SCRA 1986, 23–107. The rule grants the district judge plenary discretion to limit camera coverage for good cause. SCRA 1986, 23–107(A)(2). If the defendant objects to media coverage he must make a prima facie showing that he will be prejudiced by the media coverage. *See* SCRA 1986, 23–107(G)(2); *State v. Hovey,* 106 N.M. 300, 302, 742 P.2d 512, 514 (1987). A general assertion that the coverage will make the defendant nervous, unsupported by affidavits which address the discretionary standard articulated in *State ex rel. New Mexico Press Association v. Kaufman,* 98 N.M. 261, 648 P.2d 300 (1982), is not sufficient. *See Hovey,* 106 N.M. at 303, 742 P.2d at 515.

In this case Clark's pretrial motion to bar television coverage of the *entire* sentencing proceeding was denied. Subsequently, Clark requested that *if* the court were to grant a motion filed by the State to limit media coverage of certain juvenile witnesses, then the court should also allow Clark to testify without the distraction of television cameras. The motion was not ruled upon as the issue became moot when the State chose not to call the proposed juvenile witnesses. Clark did not pursue the issue, and he later failed to mention any potential problem with media coverage in his motion to allocute. Thus, the claim was abandoned and not preserved for appeal. SCRA 1986, 12–216(A). Moreover, Clark made no showing in his conditional request, by affidavit or otherwise, that good cause existed to bar media coverage of his allocution. He is overruled on this point of error.

IX. Jury Instructions.

1. Nonstatutory Mitigating Circumstances.

■ Clark argues that the refusal to submit to the jury his tendered instruction

concerning specific nonstatutory mitigating circumstances was error.[7] In capital cases the defendant is entitled to have the sentencing jury consider any relevant mitigating evidence. *Hitchock v. Dugger,* 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987); *see also Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1977). In this case the jury was instructed pursuant to SCRA 1986, 14–7029 that it must consider "all mitigating circumstances," and that a "mitigating circumstance is any conduct, circumstance or thing which would lead you to decide not to impose the death penalty." The instruction listed the statutory mitigating circumstances for which there was evidence, then instructed the jury that it must consider "anything else which would lead you to believe that the death penalty should not be imposed." Finally, the jury was told to consider the "character, emotional history and family history of the defendant which are mitigating."

Evidence concerning nonstatutory mitigating factors was presented to the jury and was extensively argued by defense counsel. We are not persuaded that these instructions did not afford Clark a full opportunity to have his sentencing jury consider and give effect to any mitigating impulse which the nonstatutory factors might have suggested. *Cf. Hitchock v. Dugger,* 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987) (judge's instruction to jury had the effect of precluding consideration of nonstatutory mitigating circumstances); *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) (evidence of defendant's conduct while incarcerated wholly excluded from jury's consideration); *Franklin v. Lynaugh,* 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (refusal to submit proffered instruction to jury did not prevent full consideration of mitigating evidence presented by defense). We do not agree that the instruction encouraged the jury to discount nonstatutory factors, thereby increasing the likelihood that aggravating factors would outweigh mitigating factors, as Clark suggests.

This Court previously rejected a similar challenge to the current jury instruction's predecessor, Uniform Jury Instruction, Criminal 39.30. *Compton,* 104 N.M. 683, 695, 726 P.2d 837, 849 (no error in refusing proffered instruction where jury was instructed to consider any circumstances deemed mitigating), *cert. denied,* 479 U.S. 890, 107 S.Ct. 291, 93 L.Ed.2d 265 (1986). We adhere to the view that a specific written list of nonstatutory mitigating circumstances is not required where the instruction given indicates that the list of enumerated mitigating factors is not exclusive. *Cf. People v. Free,* 94 Ill.2d 378, 69 Ill.Dec. 1, 447 N.E.2d 218, *cert. denied,* 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983); *Bowers v. State,* 306 Md. 120, 507 A.2d 1072, *cert. denied,* 479 U.S. 890, 107 S.Ct. 292, 93 L.Ed.2d 265 (1986); *State v. Linder,* 276 S.C. 304, 278 S.E.2d 335 (1981). Likewise, we conclude that the New Mexico legislature did not intend such a requirement when it drafted the Capital Felony Sentencing Act. *See* NMSA 1976, 31–20A–6 (Orig.Pamp. & Cum.Supp.1988).

## 2. Legal Standards.

■ The capital jury was given Uniform Jury Instructions 14–7028 and 14–7030.[8] Clark points out that while these

---

**7.** The nonstatutory mitigating circumstances included in the refused instruction were: the defendant was commended during service and was honorably discharged from the armed forces; the defendant suffered from post-traumatic stress disorder; and, the defendant poses no significant threat to others while confined.

The statutory mitigating circumstances included in the instruction which was given were: the defendant did not have any significant history of prior criminal activity; the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired; the defendant was under the influence of mental or emotional disturbance; cooperation by the defendant with authorities; the defendant is likely to be rehabilitated. See NMSA 1978, Section 31–20A–6 for mitigating circumstances listed by statute.

**8.** Uniform Jury Instruction 14–7028 states:

You must first consider whether one or more of the aggravating circumstances charged was present in this case. You must decide separately as to each of the aggravating circumstances.

In order for you to find an aggravating circumstance, you must agree unanimously. You

instructions require the jury to unanimously find a statutory aggravating circumstance exists beyond a reasonable doubt before a death sentence can be imposed, the jury is not provided with a legal standard for weighing the aggravating circumstances against the mitigating circumstances. Clark argues that this renders his sentence unreliable under eighth amendment standards.

Specific legal standards for balancing aggravating circumstances against mitigating circumstances in a capital sentencing proceeding are not constitutionally required. *Zant v. Stephens*, 462 U.S. 862, 876 n. 13, 103 S.Ct. 2733, 2742 n. 13, 77 L.Ed.2d 235 (1983); *State v. Cheadle*, 101 N.M. 282, 287, 681 P.2d 708, 713 (1983), *cert. denied*, 466 U.S. 945, 104 S.Ct. 1930, 80 L.Ed.2d 475 (1984); *see also Franklin*, 108 S.Ct. at 2320 (holding that no specific method is required by the Constitution for balancing mitigating and aggravating factors).

The instructions which were used indicate that in weighing the mitigating and aggravating circumstances the jury must find that the aggravating circumstances outweigh the mitigating circumstances before the penalty of death can be imposed. However, the jury is instructed that even if aggravating circumstances outweigh mitigating circumstances the jury is free to not impose the penalty of death. The jury is directed to consider both the defendant and the crime. We have recognized that a subjective standard must be used for this review. *State v. Garcia*, 99 N.M. 771, 779, 664 P.2d 969, 977, *cert. denied*, 462 U.S. 1112, 103 S.Ct. 2464, 77 L.Ed.2d 1341 (1983); *see also Zant*, 462 U.S. at 902, 103 S.Ct. at 2756 (Rehnquist, J., concurring in judgment) ("sentencing decisions rest on a far-reaching inquiry into countless facts and circumstances and not on the type of proof of particular elements that returning a conviction does"); *Ford v. Strickland*, 696 F.2d 804, 818 (11th Cir.), *cert. denied*, 464 U.S. 865, 104 S.Ct. 201, 78 L.Ed.2d 176 (1983) ("While the existence of an aggravating or mitigating circumstance is a fact susceptible to proof under a reasonable doubt or preponderance standard the relative *weight* is not") (citations omitted). These instructions adequately focused the jury's attention on the particularized na-

---

cannot consider the penalty to be imposed until you have found that one or more of the specified aggravating circumstances has been proved beyond a reasonable doubt.

A special form has been prepared for you for each of the aggravating circumstances charged. In this case, as to each of the aggravating circumstances, there are three possible verdicts:

(1) finding beyond a reasonable doubt that the aggravating circumstance exists;

(2) finding that the aggravating circumstance does not exist; or

(3) being unable to reach an agreement.

You must complete the form for each aggravating circumstance.

If you unanimously find the state had proved beyond a reasonable doubt that one or more of the aggravating circumstances was present, you shall complete the form for each aggravating circumstance you find, indicating your finding, and have the foreman sign this part.

If you are unable to agree unanimously as to any aggravating circumstance or if you unanimously find that any aggravating circumstance was not present, you shall complete the form for that aggravating circumstance, indicating your finding, and shall have the foreman sign this part. You will then consider the penalty to be imposed.

If you find that the state has not proven that one or more of the aggravating circumstances was present you shall complete the form for each aggravating circumstance. You shall indicate whether:

(1) you are unable to agree unanimously that the aggravating circumstance was present; or

(2) you unanimously find that the aggravating circumstance was not present. The foreman shall sign this part of each finding form. You will then return to the courtroom.
SCRA 1986, 14–7028.

Uniform Jury Instruction 14–7030 was submitted to the jury in the following form:

If you find any aggravating circumstance(s) that were charged you must weigh those aggravating circumstance(s) against any mitigating circumstances you have found in this case. After weighing the aggravating circumstance(s) and the mitigating circumstances, weighing them against each other, and considering both the defendant and the crime, you shall determine whether the defendant should be sentenced to death or life imprisonment. The aggravating circumstance(s) must outweigh the mitigating circumstances before the death penalty can be imposed.

However, even if the aggravating circumstance(s) outweigh(s) the mitigating circumstance(s), you may still set the penalty at life imprisonment.
SCRA 1986, 14–7030.

ture of the crime and the unique characteristics of the individual defendant, as required by the Constitution.

Clark similarly argues that a capital jury should be required to find beyond a reasonable doubt that the penalty of death is the appropriate punishment. We have previously rejected this argument. *State v. Finnell*, 101 N.M. 732, 736, 688 P.2d 769, 773, *cert. denied*, 469 U.S. 918, 105 S.Ct. 297, 83 L.Ed.2d 232 (1984).

3. Consideration of Factors other than the Statutory Aggravating Circumstances as a Basis for Imposing the Sentence of Death.

The trial judge refused Clark's requested instruction to the effect that the jury was not allowed to take into account anything other than the two charged statutory aggravating circumstances as a basis for deciding to impose the death penalty. Clark argues that the refusal to give this instruction created an impermissible risk that the jury considered aspects of Clark's background, the offense under consideration, and his prior conviction for criminal sexual penetration as aggravating circumstances. The requested instruction was properly refused.

When a jury makes its threshold decision as to the existence of an aggravating circumstance, it is explicitly restricted to the statutory aggravated circumstances "charged." SCRA 1986, 14–7028. Then, if the jury finds any "charged" aggravating circumstances, the jury must weigh *those* aggravating circumstances against any mitigating circumstances present. Those aggravating circumstances must outweigh the mitigating circumstances before the death sentence can be imposed. SCRA 1986, 14–7030. There is no indication that the jury is to consider facts and circumstances other than the statutory aggravating circumstances in this weighing process. *See State v. Guzman*, 100 N.M. 756, 760, 676 P.2d 1321, 1325, *cert. denied*, 467 U.S. 1256, 104 S.Ct. 3548, 82 L.Ed.2d 851 (1984); *see also* NMSA 1978, § 31–20A–5 (limiting

the aggravating circumstances to be considered by the jury pursuant to Section 31–20A–2 to the listed statutory aggravating circumstances). This procedure channels the sentencing decision of the jury and avoids the exercise of unbridled discretion in determining whether the death penalty should be imposed.

■ The jury is also instructed to consider "both the defendant himself and the crime" in making its final determination of whether to impose the death penalty. SCRA 1986, 14–7030. This consideration is properly before a capital jury. *See Zant*, 462 U.S. at 878–79, 103 S.Ct. at 2743–44. Once the jury has determined that a statutory aggravating circumstance exists, and that the statutory aggravating circumstance(s) outweigh mitigating factors, the jury is free to consider all relevant aspects of the defendant's character, as well as the crime itself, in making its final decision of whether or not to impose the penalty of death. For these reasons the refusal of Clark's tendered instruction was not error.

4. Unanimity Instruction.

■ The jury was instructed by the court that any finding they reached regarding the appropriate sentence to be imposed must be unanimous. The jury was provided with forms which allowed them to unanimously sentence Clark to either life imprisonment or death. The verdict form did not contain a place to sign if the jury was divided concerning the penalty to be imposed.[9] Clark argues that the court's instruction was in conflict with NMSA 1978, Section 31–20A–3. That statute directs the court to sentence the defendant to life imprisonment, "[w]here a sentence of death is not unanimously specified, or the jury does not make the required finding, or the jury is unable to reach a unanimous verdict." *Id.* Thus, Clark argues, the statute indicates that a split decision is a verdict, and therefore the unanimity instruction given by the court contravened the statute and constitutes reversible error. This contention is without merit. The statutory injunc-

---

9. Clark's proposed verdict form, which was refused by the trial judge, contained a place for the foreman to sign in the event the jury was divided.

tion is directed to the trial court, not the sentencing jury. *Cf. Brogie v. State,* 695 P.2d 538, 547 (Okla.Crim.App.1985). Section 31–20A–3 does not require that the jury return a specific verdict if unanimity is absent.

Clark also claims that the unanimity instruction was impermissibly coercive because that charge, together with Uniform Jury Instruction 14–7043, imposed upon a divided jury the duty to consult. We reject this argument also. We have previously decided that instructions such as these cannot be construed to improperly encourage individual jurors to abandon a decision to impose a life sentence in favor of a sentence of death for the sole purpose of simply maintaining unanimity. *Compton,* 104 N.M. at 694, 726 P.2d at 848.

### 5. Role of Mitigating Circumstances— "Mills Error".

■ Clark also argues that the instructions violated the principles of the recent United States Supreme Court case of *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). In *Mills,* the Court held that remand for resentencing was required where there was a substantial probability that the jurors thought they were precluded from considering any mitigating evidence unless they unanimously agreed on the existence of a particular such circumstance. 108 S.Ct. at 1870. As we have recognized, it is well established that the sentencing jury must be allowed to consider all relevant mitigating evidence. The Supreme Court in *Mills* has now decided that where there is a probability that one juror could block such consideration, and effectively require the sentencing jury to impose the death penalty, the judgment must be vacated. *Id.; see also North Carolina v. Lloyd,* 321 N.C. 301, 364 S.E.2d 316 (requiring jurors to reach unanimous decision regarding the presence of mitigating circumstances), *vacated and remanded in light of Mills v. Maryland,* — U.S. —, 109 S.Ct. 38, 102 L.Ed.2d 18 (1988).

We note that the capital sentencing procedures used in Maryland differ markedly from those used in New Mexico. In New Mexico, no vote is taken concerning the existence of any mitigating circumstance; no findings in this regard are made; and all mitigating evidence must be considered by the jury. The verdict form employed in Maryland at the time *Mills* was decided required the sentencing jury to make specific findings that particular mitigating circumstances either existed or did not exist, and that this fact had been proved by a preponderance of the evidence. Thus, the probability existed that once a jury found the presence of an aggravating circumstance, unless the jurors were to all agree on the existence of a particular mitigating circumstance, they might never engage in the weighing process or deliberate the appropriateness of the death penalty. *Mills,* 108 S.Ct. at 1868. Instead, they might impose the death sentence automatically even though individual jurors might believe that certain mitigating factors existed which should be taken into consideration. We do not believe a similar danger exists with the instructions used in this case.

At Clark's trial, the jury was instructed that they must unanimously find beyond a reasonable doubt that the aggravating circumstances existed. Similarly, the jury was instructed that any finding they reached regarding the appropriate sentence to be imposed (life imprisonment or death) must be unanimous. The jury was provided with forms for these findings. No other formal findings were requested of the jury. The jury was instructed pursuant to SCRA 1986, 14–7029 that "[i]f you find an aggravating circumstance, you must consider all mitigating circumstances. A mitigating circumstance is any conduct, circumstance or thing which would lead you to decide not to impose the death penalty."

The jury was also instructed pursuant to SCRA 1976, 14–7030 that "[i]f you find any aggravating circumstance(s) that were charged you must weigh those aggravating circumstance(s) against any mitigating circumstances you have found in this case." Clark argues that this instruction, SCRA 1976, 14–7030, suggests to the jury that they must unanimously agree as to existence of a mitigating circumstance since it directs the jury to balance aggravating cir-

cumstances against the mitigating circumstances they have *found*. We do not agree. As stated in *Mills*, "the question is whether petitioner's interpretation of the sentencing process is one a reasonable jury could have drawn from the instructions given by the trial judge and from the verdict form employed." *Id.* 108 S.Ct. at 1866. For a jury to reach the interpretation which Clark urges, the jury would have to ignore the previous instruction, SCRA 1986, 14–7029, that, should they decide an aggravating circumstance exists, they *must* then consider *all* mitigating circumstances.

The first instruction submitted to the jury was to "consider these instructions as a whole" and "not pick out one instruction or parts of an instruction or instructions and disregard others." SCRA 1986, 14–6001. There is a presumption that jurors will adhere to their instructions. *State v. Chase*, 100 N.M. 714, 676 P.2d 241 (1984). We conclude that no reasonable jury would have understood these instructions to preclude individual jurors from considering any mitigating evidence they believed was present unless the entire jury were to unanimously agree on the existence of a particular such circumstance.

X. Supreme Court Review Under Section 31–20A–4(C).

Under the Capital Felony Sentencing Act, Section 31–20A–4(C), we are to review a sentence of death and find that sentence invalid if: (1) the evidence does not support the finding of a statutory aggravating circumstance; (2) the evidence supports a finding that the mitigating circumstances outweigh the aggravating circumstances; (3) the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; or (4) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. NMSA 1978, § 31–20A–4(C) (Orig. Pamp. & Cum.Supp.1988).

Clark does not argue that insufficient evidence supports the finding of the first aggravating circumstance, murder during the commission of a kidnapping. His guilty plea supports such a finding. While Clark disputes the validity of the second aggravating circumstance, murder of a witness for the purpose of preventing report of a crime, for the reasons stated in Section VII we reject that argument and find ample evidence exists to support such a finding.

Clark makes no attempt to discuss the evidence in mitigation and argue that a sentence of life imprisonment should have been imposed. At trial, the major mitigating evidence presented to the jury consisted of psychological evidence which purported to demonstrate that his criminal behavior was the result of a traumatic incident which occurred during the rescue of Vietnamese boat people during his service with the Navy. Two psychologists proposed that this traumatic experience, followed by his involvement with Filipino child prostitutes, came to the surface following a blow on the head five years later, and triggered the attack on his first victim and later the attack on Dena Lynn Gore. On rebuttal, the State presented a former shipmate of Clark who testified that he recalled no incidents of combat, helicopter assaults on pirate ships, or wounded boat people as described by Clark to his psychologists. Other mitigating evidence which Clark presented consisted of his voluntary guilty plea; his honorable service record in the Navy; and his good conduct while incarcerated in prison awaiting trial.

The evidence of Clark's prospects for rehabilitation was inconclusive. A defense expert who testified that he had a good success rate treating sex offenders also stated that his program did not include those who killed during the commission of the sexual offense. Another expert testified that a rapist-murderer was the most difficult sex offender to treat.

A review of the evidence of mitigating circumstances supports the jury's determination in this case. *See Guzman*, 100 N.M. 756, 761, 676 P.2d 1321, 1326, *cert. denied*, 467 U.S. 1256, 104 S.Ct. 3548, 82 L.Ed.2d 851 (1984). The evidence does not support a finding that mitigating circumstances

outweigh the aggravating circumstances of Clark's crimes.

Regarding the third statutory inquiry mandated by Section 31–20A–4(C), Clark submits that his sentence was imposed under the influence of all of the arbitrary factors which he has raised thus far. For the reasons discussed in detail in previous sections of this opinion, we reject that argument.

 Lastly, this Court under Section 31–20A–4(C) must review the sentence in order to determine if it is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." We established our guidelines for this review in *State v. Garcia*, 99 N.M. 771, 780, 664 P.2d 969, 978, *cert. denied*, 462 U.S. 1112, 103 S.Ct. 2464, 77 L.Ed.2d 1341 (1983). In reviewing a sentence under these guidelines we will compare other New Mexico cases in which a capital defendant has been convicted of capital murder under the same aggravating circumstances, and then received *either* the sentence of death or life imprisonment. *Id.* We will, however, review this issue only when raised. *Id.* Since Clark does not refer this Court to similar New Mexico cases for comparison, we will not undertake such a review at this time.

Rather than refer this Court to similar cases for a proportionality review, Clark argues that the *Garcia* guidelines are unduly restrictive. He argues that the guidelines should be broadened by this Court to include comparison with cases in which the death penalty could have been sought but was not, as well as cases in which the death penalty was sought but which ended either in a plea of guilty to a noncapital offense or with the jury's failure to find the existence of the alleged statutory aggravating circumstance. We agree with the State that Clark does not present this Court with a question to review. He does not allege, or make any showing, that his sentence would be disproportionate if compared to this pool of cases. This court does not give advisory opinions. *See State v. Hines*, 78 N.M. 471, 474, 432 P.2d 827, 830 (1967).

We reject Clark's argument that he was unable to gain access to this pool of cases. As we noted in *Garcia*, 99 N.M. at 780, 726 P.2d at 978, it is the duty of the defendant's attorney to supply the Court with information of similar cases. The information is a matter of public record. *Id.; see* NMSA 1978, §§ 14–3–1 to –25 (Repl.Pamp. 1988).

XI. Cumulative Error.

Clark argues that the cumulative impact of the errors which occurred at the sentencing proceeding requires reversal. We have addressed his claims and decided either that no errors were committed or that certain errors which were waived did not individually amount to fundamental error. We are not persuaded that there is a reasonable probability that the cumulative prejudicial effect of those errors, testimony on the cost of incarceration and comment on Clark's failure to testify, changed the outcome of the sentencing hearing. The doctrine of fundamental error has no application where the record does not reveal the type of cumulative error that would change the result. *State v. Hamilton*, 89 N.M. 746, 751, 557 P.2d 1095, 1100 (1976).

CONCLUSION

Twenty-three issues were initially raised in Clark's docketing statement. The issues not addressed here were not briefed and are, therefore, abandoned. *State v. Foye*, 100 N.M. 385, 671 P.2d 46 (Ct.App.1983).

For the foregoing reasons, we determine that the convictions of Terry Clark and the sentence of death imposed upon him for the murder of Dena Lynn Gore should be affirmed.

IT IS SO ORDERED.

STOWERS and BACA, JJ., concur.

SOSA, C.J., specially concurs.

RANSOM, J., dissents.

SOSA, Chief Justice, specially concurring.

I concur in the majority opinion insofar as it affirms Clark's conviction for kidnap-

ping and first-degree murder. I dissent, however, from that portion of the opinion which affirms the jury's imposition of the death penalty. In my estimation, the trial court erred in not sentencing Clark on the kidnapping charge and in not informing the jury, prior to its deliberations on the death penalty, as to the sentence which Clark would have received on the kidnapping charge. I disagree with the majority's conclusion that, "The sentencing prerogatives of the trial judge, or the possible length of a life sentence, simply have no relevance under Eighth Amendment standards as they have developed so far."

As I read the Supreme Court's decision in *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the length of time a convicted capital felon would serve in prison for another crime for which he has been convicted should, at the request of the defendant, be considered by the jury as a mitigating factor when the jury deliberates on the death penalty. The Court wrote:

> [W]e conclude that the Eighth and Fourteenth Amendments require that the sentencer * * * not be precluded from considering *as a mitigating factor* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis of a sentence less than death.

*Id.,* at 604, 98 S.Ct. at 2964 (emphasis in original).

The fact that Clark already had been convicted of a kidnapping is unquestionably a part of his "record." The fact that his conviction for kidnapping is not a salutary part of his record, in the same sense that facts concerning his character or good conduct might be, is irrelevant. It seems to me that the Court in *Lockett v. Ohio* was concerned both about the nature of the information proffered to the jury in mitigation as well as about the motivation behind the defendant's proffering the information —namely, to persuade the jury to impose a sentence less than death. In my opinion, Clark's attempt to proffer his sentence on the kidnapping conviction was part of his record and was intended to persuade the jury to return a sentence other than death. Therefore, under *Lockett,* the trial court should have imposed that sentence prior to the jury's deliberation on the death penalty; and the jury then should have been instructed on the sentence.

The Supreme Court has held that consideration by a jury of a convicted capital felon's future dangerousness and the relationship of that dangerousness to the length of time he must serve in prison before he can be paroled is a proper subject for the jury's deliberation when it sits to decide whether the defendant should receive the death penalty. *California v. Ramos,* 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed. 2d 1171 (1983); *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). Here Clark wanted the jury to know that he faced a lengthy prison term for kidnapping. If the trial court would have imposed the basic eighteen-year sentence for kidnapping, it could have increased that sentence by one-third, for a sum of twenty-four years. In addition, the trial court could have enhanced that sentence by another two years, for a sum of twenty-six years. If the court then ordered that sentence to be served consecutively with Clark's previous twenty-four year sentence on the earlier conviction, and if these sentences were made known to the jury, the jury then would have known, before it began its deliberations on the death penalty, that Clark already had been sentenced to fifty years in prison. Such information clearly would have been a mitigating factor, under *Lockett,* that may have changed the outcome of the jury's decision on the death penalty.

In addition, I would make it mandatory in a situation such as this one, where a convicted capital felon asks that the jury be informed as to the length of time to which he has been sentenced on another crime, for the trial court to instruct the jury on the provisions of NMSA 1978, Section 31–21–10 (Supp.1988), to the effect that, "An inmate of an institution who was sentenced to life imprisonment as the result of the commission of a capital felony becomes eligible for a parole hearing after he has served thirty years of his sentence."

NMSA 1978, § 31–21–10(A). I am aware that NMSA 1978, Section 33–2–34 (Repl. Pamp.1987), provides for certain "meritorious deductions" to be subtracted from a convicted felon's time served, but I read that statute as not affecting the more narrowly drafted provisions of Section 31–21–10, so that a capital felon who is sentenced to life imprisonment may not be eligible for parole before he has served thirty years.

This information too should have been presented to the jury deliberating over Clark's sentence. Had the jury known both of Clark's possible fifty-year sentence for previous convictions, and of the mandatory thirty-year imprisonment under a life sentence, they then would have known that Clark faced the possibility of eighty years in prison, or a true life term. Then the jury would have been faced with an actual alternative between imposition of the death penalty and imposition of a life sentence. As it happened, however, especially after the bewildering testimony presented at trial, and after the prosecutor's closing argument to the effect that Clark would certainly be released from prison, the jury's choice was not one of life vs. death, but of death vs. releasing a dangerous felon in perhaps a short period of time after he had entered the penitentiary. It was constitutionally impermissible to present this latter choice to the jury.

I agree with the Court's reasoning in *California v. Ramos:* "What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine." 463 U.S. at 1004, 103 S.Ct. at 3455. Here the jury did not have all relevant information before it, and because the trial court did not give it this information on Clark's request, the court committed fundamental error. "States cannot limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the [death] penalty." *McCleskey v. Kemp,* 481 U.S. 279, 306, 107 S.Ct. 1756, 1774, 95 L.Ed. 2d 262 (1987). "[T]he qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination," *Caldwell v. Mississippi,* 472 U.S.

320, 329, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985) (quoting *California v. Ramos,* 463 U.S. 992, 998–999, 103 S.Ct. 3446, 3451–52, 77 L.Ed.2d 1171 (1983)). In the present case I find the majority's scrutiny of the jury's sentencing determination to be constitutionally inadequate. I would reverse the death sentence and remand this case to the trial court for a new sentencing hearing to be conducted in a manner that is not inconsistent with the above.

RANSOM, Justice (dissenting in part).

I respectfully dissent; I would remand for a new sentencing proceeding in which the jury would decide whether to impose the death sentence or life imprisonment.

The death sentencing proceeding in the trial court and the majority opinion of this Court conspire to defeat the legislative mandate that the jury determine *whether the defendant should be sentenced to death or life imprisonment.* NMSA 1978, §§ 31–20A–1(B), 31–20A–2(B) (Repl.Pamp. 1987). The legislature has clearly provided that an inmate sentenced to "life imprisonment" is ineligible for a parole hearing before he has served thirty years of his sentence. NMSA 1978, § 31–21–10(A) (Supp.1988). For imposition of death, the jury must weigh the evidence presented as to the circumstances of the crime and as to any aggravating or mitigating circumstances, Sections 31–20A–1(C) and 31–20A–2(B), and choose between either (a) death or (b) life imprisonment without possibility of parole for a definite thirty-year period to begin no sooner than a time made certain under the sentencing authority of the trial court. In reviewing the jury's choice, this Court must adhere to the legislative mandate that the death penalty not be imposed if the sentence is found to have been influenced by any arbitrary factor, i.e., caprice or speculation. § 31–20A–4.

*Special scrutiny.* I accept without reservation the legislature's constitutional authority under *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), to craft death penalty statutes consistent with the eighth amendment's prohibition against

cruel and unusual punishment. This Court has held our legislature's capital sentencing statutes to be constitutional. *State v. Garcia,* 99 N.M. 771, 664 P.2d 969, *cert. denied,* 462 U.S. 1112, 103 S.Ct. 2464, 77 L.Ed.2d 1341 (1983). However, in order to assure reliability in any decision that subjects an individual to the ultimate and irrevocable sanction, death penalty determinations require special scrutiny of fundamental error claims. *State v. Compton,* 104 N.M. 683, 726 P.2d 837, *cert. denied,* 479 U.S. 890, 107 S.Ct. 291, 93 L.Ed.2d 265 (1986). " '[T]he qualitative difference of the death penalty requires a correspondingly greater degree of scrutiny of the capital sentencing determination.' " *Id.* at 688, 726 P.2d at 842 (quoting *Caldwell v. Mississippi,* 472 U.S. 320, 329, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985), quoting, *California v. Ramos,* 463 U.S. 992, 998–99, 103 S.Ct. 3446, 3451–52, 77 L.Ed.2d 1171 (1983)); *see, e.g., Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Moreover, death penalty determinations impose requirements of special scrutiny of eighth amendment claims, perhaps chief among which is the right of the defendant to proffer any factors that may mitigate against death. *See Ramos,* 463 U.S. at 1000–1001, 103 S.Ct. at 3452–53; *Lockett,* 438 U.S. at 604, 98 S.Ct. at 2964; *Woodson,* 428 U.S. at 304, 96 S.Ct. at 2991.

*Fundamental error.* A substantial portion of Clark's death penalty hearing was devoted to evidence and arguments on the possibility of commutation or pardon, parole, the costs of incarceration, and legislative or judicial actions that could impact the sentence of life imprisonment. The majority opinion concedes this was inconsistent with the decision-making role that the legislature set out for the jury. It is clear to me that the jury had to be in complete and utter confusion over the choice they were to make, and I believe this constituted a miscarriage of justice in the sentencing proceeding. Any miscarriage of justice is fundamental error. As we recently reiterated in *State v. Escamilla,* 107 N.M. 510, 515, 760 P.2d 1276, 1281 (1988), while fundamental rights may be waived, fundamental error cannot be waived and such error requires a new trial.

To preclude application of the doctrine of fundamental error, the majority opinion relies on *State v. Cheadle,* 101 N.M. 282, 287, 681 P.2d 708, 713 (1983), *cert. denied,* 466 U.S. 945, 104 S.Ct. 1930, 80 L.Ed.2d 475 (1984), which held fundamental error did not apply when the defendant failed to object to proposed jury instructions in a death penalty sentencing. The majority opinion concludes that Clark cannot now complain because, by asking a witness about the minimum term of incarceration he might serve, Clark opened the door to the prosecutor's admittedly improper remarks. While I agree that the error alleged in *Cheadle* did not result in a miscarriage of justice, the majority's reliance on that case begs the question. If fundamental error occurred, by definition it was not waived. The same can be said of *State v. Padilla,* 104 N.M. 446, 451, 722 P.2d 697, 702 (Ct.App.), *cert. denied,* 104 N.M. 378, 721 P.2d 1309 (1986) (when defendant requested 'an instruction on manslaughter, there was no fundamental error, and he would not be heard to complain that the evidence did not warrant such an instruction). Furthermore, I concur in the *Padilla* dissent of Judge Minzner.

The majority appears to equate fundamental error with a denial of due process rights, which requires state action and which includes rights that can be waived. While I believe that the concept of due process will often be implicated when the doctrine of fundamental error must be applied, I understand fundamental error as a broader doctrine, which enables an appellate court to correct manifest injustice even in cases where the claim of error does not lie within an existing rule.

\*　　\*　　\*　　\*　　\*　　\*

The majority in effect holds that defendant waived his right to object to lack of substantial evidence by offering the instruction on voluntary manslaughter, and because he waived that right, no fundamental error occurred. I would an-

alyze the issues differently; first, we must determine whether fundamental error is involved and then, if not, we may determine whether the relevant right was waived. We ought not limit our discretion to correct fundamental error in an appropriate case.

*Id.* at 452, 722 P.2d at 703.

I don't believe the question of eligibility for parole from a life sentence raised a factual issue that was subject to proof by means of expert testimony. What constitutes a life sentence is a question of law, and the answer to that question is that the sentence is for life, with the possibility of parole after thirty years. § 31–21–10(A). In a death penalty proceeding, presentation to the jury of incompetent testimony and speculative arguments on matters of statutory interpretation was fundamental error. This Court should so hold.

Moreover, the allegations of error here point to a systematic attempt by the prosecutor to convince the jury that the only meaningful sentence was the death sentence, by means of speculative testimony and arguments about possible legislative changes, federal intervention under the *Duran* consent decree, inquiry into the cost of incarceration, and the possibility of commutation. In closing, the prosecutor argued that a life sentence did not pose a question *whether* Clark would be released from prison, but *when* he would be released, that Clark's release was "inevitable," and that his release might occur within ten years.

When a defendant's life hangs in the balance, prosecutorial overreaching should not be excused by defense counsel's failure to object. Although I do not believe testimony on the meaning of the sentencing statutes was appropriate, if it were to be acknowledged that the prosecutor was entitled to cross-examine the defense witness on matters reasonably raised on direct examination, *Jaramillo v. Fisher Controls Co.*, 102 N.M. 614, 698 P.2d 887 (Ct.App. 1985), in this case the prosecutor went well beyond the scope of direct examination into matters which were both highly speculative and highly prejudicial. *See State v. Mar-*

*tin,* 101 N.M. 595, 601, 686 P.2d 937, 943 (1984); *cf. Ex parte Rutledge,* 482 So.2d 1262 (Ala.1984).

It is therefore misleading and unfair to suggest that Clark "created" the error here. Such a statement suggests that under the guise of the "reply in kind" doctrine a prosecutor may violate the defendant's eighth amendment rights with impunity. Such a holding is incompatible with the doctrine of fundamental error and the need for meaningful appellate review of death sentence determinations. *See Eddings v. Oklahoma,* 455 U.S. 104, 118, 102 S.Ct. 869, 878, 71 L.Ed.2d 1 (1982) (O'Connor, J., concurring) (as much as humanly possible, death sentence determinations must not be based on whim, passion, prejudice, or mistake).

*The mitigating factor of noncapital sentencing.* Further, I believe the trial court was without discretion to deny the defendant's request to have the jury informed of his noncapital sentence prior to its deliberation on the capital sentencing. I am firmly convinced that under eighth amendment jurisprudence the defendant was entitled to have the jury apprised of this information. Under *Lockett,* a capital sentencing jury must be allowed to consider, as a mitigating factor, any circumstances of the offense that the defendant proffers as a basis for a sentence less than death. 438 U.S. at 604, 98 S.Ct. at 2964.

The majority opinion erroneously limits the scope of relevant mitigating evidence to the defendant's own conduct and background and concludes that "the sentencing prerogatives of the trial judge, or the possible length of a life sentence, simply have no relevance under eighth amendment standards as they have developed so far." 108 N.M. at 295, 772 P.2d at 329. However, in *Ramos* the Court reasoned that the possibility the defendant may be returned to society focuses the jury's attention on the defendant's probable future dangerousness and is therefore "'relevant information about the individual defendant whose fate it must determine.'" 463 U.S. at 1003, 103 S.Ct. at 3454 (quoting *Jurek v. Texas,* 428 U.S. 262, 276, 96 S.Ct. 2950, 2958, 49 L.Ed.

**316**

2d 929 (1976)). Whereas the length of incarceration may be relevant to the aggravating circumstance of future dangerousness in one sense, it clearly may be relevant as mitigation from the defendant's perspective in another. *See Skipper v. South Carolina,* 476 U.S. 1, 5, 106 S.Ct. 1669, 1671, 90 L.Ed.2d 1 (1986) (evidence that a defendant would not pose a danger if incarcerated rather than put to death must be considered potentially mitigating).

Moreover, I find unpersuasive the argument that such sentencing information should be denied the jury because it may have an impermissible prejudicial effect. Admittedly, the jury could interpret the sentencing decision of the trial court as a reflection of the defendant's culpability. However, *Lockett* and its progeny require that the defendant be allowed to place before the jury any relevant mitigating circumstance. "States cannot limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the [death] penalty." *McClesky v. Kemp,* 481 U.S. 279, ——, 107 S.Ct. 1756, 1774, 95 L.Ed.2d 262 (1987).

Therefore, if the defendant decides it is in his best interest to have the jury apprised of this information before it deliberates upon the capital sentencing, the trial court is without discretion to withhold it from the jury. It is certainly a matter the court would have in mind if sentencing without benefit of a jury. The jury likewise necessarily must know when the minimum thirty-year period of the life imprisonment is to begin. Here, the court had in mind that, before life imprisonment was to begin, this child rape-murder was serious enough to warrant the maximum sentences, i.e., twenty-four years to be served consecutively with the twenty-four year sentence previously imposed, plus one year each for use of a firearm and as an habitual offender, subject to meritorious deductions and parole.

Assuming maximum good time for the noncapital offenses, a life sentence would have assured incarceration to age eighty-six. The prosecution could argue release as early as age forty-one only by asking the jury to *speculate* on what the noncapital sentence might be, and on what the executive, legislative or judicial officers or bureaucrats *might* do to change the current meaning of a life sentence. The jury was faced with false issues that were not intended by the legislature nor permitted by the requirements of the eighth amendment.

Because length of incarceration is relevant, it is necessary to address whether gubernatorial postsentence remedies, such as commutations and pardons, or other sentence-reduction mechanisms, such as parole and meritorious deductions, are proper subjects for capital sentencing deliberations. I agree with the majority that the possibility of commutation or pardon of a sentence should not enter the sentencing calculus. Whereas *Ramos* held it is not a violation of eighth amendment rights to instruct the jury as to commutation authority relevant and material to the meaning of "life imprisonment without possibility of parole," this Court is not precluded from requiring a more strict standard of inadmissible speculation. Such speculation is inconsistent with the jury's proper decision-making role. These extraordinary postsentencing remedies are an exercise of executive discretion and injection of such considerations into the capital sentencing process would undermine the legislative intent that the jury make a reasoned choice between death and life imprisonment.

As the majority opinion notes, a substantial number of other states have interpreted their statutes to prohibit jury consideration of parole eligibility. Our statutory sentencing scheme, however, should lead us to a contrary view. The trial court should instruct the jury on the definition of life imprisonment, tracking the language of Section 31–21–10(A). When collateral noncapital sentences are also at issue, if the defendant chooses to have the jury informed of the sentences to be imposed for those collateral offenses, then the trial court also should instruct the jury on parole eligibility and the possibility of meritorious deductions for these other offenses.

On remand, the jury should be specifically instructed that, for consideration of mitigating circumstances, unanimity on the existence of a mitigating circumstance is not required. *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). While *Mills* is distinguishable (Clark went to the jury without a verdict form requiring a specific finding on each mitigating circumstance, as in *Mills*), and reversal is not required on this point, it would be well for a clarifying instruction to be given.